IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KAEISHA ROBINSON, Defendant. | No. 15-CR-71-CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's amended motion for compassionate release. (Docs. 42 & 43). The government timely filed a resistance. (Doc. 45). Defendant did not file a reply. For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

From at least May 2011 through February 2013, defendant prepared and filed at least 128 fraudulent tax returns. (Doc. 30, at 5). At least one co-conspirator assisted her in the scheme. (*Id.*, at 8). Some of the returns were under defendant's name while others were under the names of her family and friends, some of whom were aware of her scheme while others were not. (*Id.*, at 5–7). Defendant falsified the returns in a variety of ways to maximize the return she would receive. (*Id.*, at 5). Some of the returns resulted in tax refunds while others were denied as fraudulent. (*Id.*). In total, defendant claimed $693,064 in tax refunds and received $336,380. (*Id.*). Defendant possessed numerous identification documents, concealed her transactions by having a friend open a bank account to deposit the refunds, attempted to dispose of evidence relating to her

offense, and initially minimized her role in the scheme when interviewed by officers. (*Id.*, at 7–8). Throughout her scheme, defendant committed aggravated identify theft against multiple people. (*Id.*, at 8). She also falsified housing assistance forms by representing that her only sources of income were social security benefits and food stamps so that she could receive $12,142 in assistance payments. (*Id.*, at 9).

On July 29, 2015, a grand jury issued an Indictment charging defendant with 13 counts of filing false claims for tax refunds, nine counts of theft of government property, and two counts of aggravated identity theft. (Doc. 2). On August 29, 2016, an Information additionally charged defendant with a third count of aggravated identity theft and one count of making false statements. (Doc. 17). On September 2, 2016, defendant pled guilty to one count of theft of government property ("Count 21"), one count of aggravated identity theft ("Count 25"), and one count of making false statements ("Count 26"). (Doc. 22).

On November 14, 2016, the United States Probation Office filed defendant's final presentence investigation report. (Doc. 30). Defendant was 38 years old. (*Id.*, at 3). Defendant was raised by her mother after her parents separated when she was 13 years old. (*Id.*, at 19). Her father had histories of criminal conduct, mental health issues, and substance abuse, and was physically and mentally abusive towards defendant. (*Id.*). Defendant was sexually abused by a cousin and one of her brothers. (*Id.*). That brother was later incarcerated for unrelated reasons. (*Id.*, at 20). Defendant's other brother noted that defendant began committing fraud at a young age, describing it as a "sickness." (*Id.*). Defendant completed high school and applied to beauty school, which she paid for via a fraudulent check. (*Id.*, at 24). She had minimal employment history; none since 2008. (*Id.*). She reported no income to the Social Security Administration in most years and had $15,181 in credit card debt. (*Id.*, at 25). Although defendant's accounts conflict with her records on some facts, defendant had six children. (*Id.*, at 20–21). She was

2

married from 2009 to 2015. (*Id.*, at 21). Her ex-husband was reportedly abusive and had histories of criminal conduct and drug abuse. (*Id.*). Various abuse cases had been filed in relation to the family. (*Id.*).

As to her health, defendant reported lifelong diabetes and significant neuropathy. (*Id.*, at 22). Defendant had long received mental health treatment and was diagnosed with bipolar disorder and post-traumatic stress disorder. (*Id.*). She also reported that she has an anger problem. (*Id.*). Defendant reported that she had never used alcohol or marijuana, but records reflected that defendant had provided a variety of inconsistent accounts about her use of substances in the past. (*Id.*, at 23). She had recently reported regular use of alcohol and daily use of marijuana. (*Id.*, at 23). Defendant had undergone addiction education and substance abuse treatment in the past. (*Id.*).

Defendant's criminal history was significant. She had been convicted of forgery and misuse of a credit card (for stealing customers' credit cards while working at a Target), deceptive practices, financial identity theft, driving on a suspended license three times, forgery (for depositing fraudulent checks), writing a bad check, issuing a forged document (for fraudulently drawing on another person's account in order to attend beauty school and obtain a cosmetology kit), theft and forgery (for opening and drawing on fraudulent bank accounts), theft three more times, and credit card fraud (for using a stolen debit card to purchase $5,800 worth of merchandise at a Walmart). (*Id.*, at 11–17). In several cases, defendant obtained the victims' personal information by offering to help them with their finances. (*Id.*). Her probation or parole was revoked three times, and she committed many of her offenses while under court supervision, including the instant offense. (*Id.*). On at least one occasion, defendant's records show that she lied to her probation officer repeatedly and egregiously. (*Id.*, at 15) (noting defendant's "inability to be honest with whatever correctional staff she was working with").

3

On December 28, 2016, the Court sentenced defendant. (Doc. 34). Under the parties' agreement, defendant was in criminal history category VI with a total offense level of 15, yielding an advisory guideline range of 41 to 51 months' imprisonment followed by at least two years on supervised release. (Docs. 30, at 27; 32). The Court varied upward and sentenced defendant to 84 months' imprisonment (60 months on Counts 21 and 26 to run concurrently and 24 months on Count 25 to run consecutively) followed by three years on supervised release. (Doc. 35).

In May 2020, the Bureau of Prisons ("BOP") placed defendant on home confinement. (Doc. 43-5, at 88).[1] Her home confinement status was revoked, and she was sent back to prison, however, after she provided a urine sample on June 29, 2020, that tested positive for marijuana. (Doc. 43-11). On September 10, 2020, defendant filed a pro se motion for compassionate release. (Docs. 39 & 44). After the Court appointed counsel to defendant (Doc. 41), she filed her amended motion for compassionate release now before the Court. (Docs. 42 & 43). Defendant is currently incarcerated at Chicago MCC with a projected release date of July 22, 2022.[2]

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Although some courts disagree, this

---

[1] It appears the exact date was May 18, 2020, but the Court is uncertain. (Doc. 43-5, at 254).

[2] *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

4

Court holds that defendants are not required to administratively appeal a warden's denial and may satisfy Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion for compassionate release in the courts. *United States v. Burnside*, 467 F. Supp. 3d 659, 667 (N.D. Iowa 2020) (compiling cases).

The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

United States Sentencing Guidelines ("USSG") Section 1B1.13 defines "extraordinary and compelling reasons" as used in Section 3582(c)(1)(A)(i). Section 1B1.13 provides that such reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physical or mental deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the

incapacitation of the defendant's spouse who now requires the defendant's care; or (5) is experiencing some other extraordinary and compelling reason as determined by the BOP. Although some courts disagree, this Court holds that Section 1B1.13 is not binding because it predates the First Step Act of 2018's amendments to Section 3582(c)(1)(A) which enabled defendants to bring motions for compassionate release on their own behalf. *United States v. Crandall*, No. 89-CR-21-CJW-MAR, 2020 WL 7080309, at *5 (N.D. Iowa Dec. 3, 2020). The Court recognizes, however, that Section 1B1.13 should still be considered a helpful guidepost in determining whether extraordinary and compelling reasons exist to release a defendant. *Id*.

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

Defendant submitted a request for release to her warden on October 10, 2020. (Doc. 43-1). On November 10, 2020, the warden denied her request. (Doc. 43-2). Thus, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A) because 30 days have lapsed from the date the warden of her facility received her request. *See Burnside*, 467 F. Supp. 3d at 667; *see also United States v. Polk*, No. 13-CR-2011 CJW-MAR, 2020 WL 4207550, at *4 (N.D. Iowa July 22, 2020) (holding a request for release need not mention the COVID-19 pandemic if it was denied at a time when the pandemic necessarily would have been considered).

### B. *Extraordinary and Compelling Reason*

Defendant argues that an extraordinary and compelling reason for release is present because her type I diabetes, severe neuropathy (in her legs, hands, arms, and feet), obesity, peripheral vascular disease, stage 3 Charcot foot, chronic kidney disease, and hypertension place her at a substantially higher risk of severe outcomes from COVID-19. (Doc. 43, at 6–15). The government concedes that the Court would be warranted

6

in finding that extraordinary and compelling reasons for release exist here because defendant's health conditions likely increase her risk to COVID-19. (Doc. 45, at 15).

The COVID-19 pandemic can constitute an extraordinary and compelling reason for compassionate release if the defendant is at a substantially higher risk of severe outcomes from COVID-19 due to age or underlying health conditions. *See Burnside*, 467 F. Supp. 3d at 668 (compiling cases). The Centers for Disease Control and Prevention ("CDC") recognizes type I diabetes and hypertension as potential, but not known, risk factors relevant to COVID-19.[3] The CDC recognizes that persons with a BMI in excess of 30 or a chronic kidney disease are at increased risk to COVID-19. *Id.* The CDC does not explicitly discuss neuropathy, peripheral vascular disease, or Charcot foot as being relevant to COVID-19. *Id.* A person's risk to COVID-19 also increases with age.[4] Eight out of ten deaths related to COVID-19 in the United States have been in adults older than 65. *Id.* Persons over age 85 are at "[t]he greatest risk for severe illness from COVID-19." *Id.* Currently, four inmates and 38 staff persons are positive for COVID-19 at Chicago MCC, another 296 inmates and 29 staff have recovered, and no one from either group has died.[5]

Defendant is 42 years' old. (Doc. 30, at 3).[6] Thus, although the Court notes her age, she is not in or near being in a high-risk age group.

Defendant's records show that she has relevant underlying health conditions that place her at a higher risk of severe outcomes if she contracts the virus. She is a Care

---

[3] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Dec. 29, 2020).

[4] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Dec. 13, 2020).

[5] *COVID-19*, BOP, https://www.bop.gov/coronavirus/.

[6] Some records state defendant is 43 years' old. *See, e.g.*, (Doc. 43-5, at 88). This discrepancy is immaterial.

7

Level 3 inmate. (Doc. 43-4, at 82). Her chronic kidney disease is noted as being in stage three or four. (Doc. 43-5, at 51). Defendant's height and most recent weight show her BMI is 41.6 (Doc. 43-5, at 309), thus putting her well-above the CDC's risk-threshold. Both these conditions are known to increase her risk during the pandemic.

Type I diabetes, however, is only recognized as a potential risk factor. The Court has considered type I diabetes in its analysis in the past, particularly when the defendant's condition is severe. *E.g.*, *United States v. Noye*, No. 19-CR-78 CJW-MAR, 2020 WL 4207553, at *5 (N.D. Iowa July 22, 2020). Here, defendant's diabetes is complicated by retinopathy, neuropathy in all her limbs, peripheral vascular disease, arthropathy, diabetic ketoacidosis, and hypoglycemia. (Doc. 43-3, at 72, 74; 43-5, at 260). Her condition is noted as uncontrolled. (Doc. 43-5, at 51, 54, 260). She recently sustained a significant burn on her hip. (Docs. 43-4; at 67–68; 43-5, at 1, 24, 27, 261). She recently lost a toe on her right foot due to her diabetes and lost a toenail on another occasion. *See, e.g.*, (Docs. 43-3, at 31; 43-4, at 62). She now also suffers from stage 3 Charcot foot in both of her feet (Doc. 43-3, at 56), a serious complication from diabetes that causes the bones, joints, and soft tissues in a person's foot or ankle to weaken.[7] As a result, she cannot bear weight on her feet and is wheelchair-bound. (Doc. 43-5, at 36, 74). She also has Charcot Arthropathy and hammertoe deformities in both feet. (Docs. 43-4, at 147; 43-5, at 261). She is also documented as having an autonomic dysfunction and it is suspected that she has Keratoconus. (Docs. 43-4, at 75; 43-5, at 59). There is little question that diabetes has taken a significant toll on her health and is properly considered in the Court's analysis here.

---

[7] *Charcot Foot*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15836-charcot-foot.

Hypertension is also a potential risk factor which the Court has similarly only given significant weight in its analysis when it is consistent and severe. *United States v. Clutts*, No. 18-CR-70-CJW-MAR, 2020 WL 6531915, at *6 (N.D. Iowa Nov. 5, 2020). Here, defendant's hypertension is uncontrolled. (Doc. 43-5, at 260). She is frequently in stages of hypertension and, on occasion, even in hypertensive crisis. (Docs. 43-3, at 33; 43-5, at 21–22, 35, 48, 96, 106, 131, 142, 163). Given its consistency and severity, defendant's hypertension should also be considered as a risk factor here.

Dr. Francois Rollin, an Assistant Professor of Medicine at the Emory University School of Medicine, has reviewed defendant's medical records and supports her motion here, stating defendant is "at extremely high risk of hospitalization, severe illness, and/or death if she were to be infected with" COVID-19 and that all possible measures should be taken to protect her from the virus. (Doc. 43-6); *see also* (Doc. 43-7).

Although defendant asserted in her pro se motion that she was not receiving adequate care (Doc. 39), the record shows that she is well-medicated, has access to medical staff, and has even been offered medical devices and specialized treatments to address her chronic health issues. Notably, defendant refused to consult with a kidney specialist in November 2020. (Docs. 43-4, at 138). She refused to see an eye specialist. (*Id.*, at 140). She refused radiological examination for her feet and declined to take several recommended medications. (Doc. 43-3, at 2, 63). She also refused to use a rolling walker. (*Id.*, at 79). Defendant also has a documented history of noncompliance with her medications. (Doc. 43-5, at 88). On one occasion, staff suspected that defendant was giving some of her medication to other inmates, but she denied doing so. (*Id.*, at 47). Further, she has been argumentative with staff about wearing a mask when in contact with medical personnel. (Doc. 43-5, at 119) ("Inmate . . . started coming to door of cell without mask on. Inmate was instructed to place mask on her face. Inmate started yelling at nurse about wearing mask."). In sum, although defendant has chronic health issues,

9

it appears her conditions are worsened to some extent by her noncompliance with medical treatment. Her resistance to preventative COVID-19 measures is also troubling.

Given all the known and potential risk factors discussed here as well as defendant's related health issues, defendant is at a substantially higher risk of severe outcomes if she contracts COVID-19. This is true even considering the noncompliance issues discussed. The combination and her medical conditions and the pandemic constitutes an extraordinary and compelling reason for release. The Court must still, however, consider whether release is appropriate under the Section 3553(a) factors.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's underlying offense is serious. She knowingly falsified and filed 128 tax returns, requesting $693,064 in refunds over more than a year. Despite many of her filings being flagged as fraudulent, she received $336,380. She filed these returns whether their subject was aware of her scheme or not. Defendant conspired with at least one other person, took significant efforts to evade detection, and was not forthcoming

10

with officers. All the while she was unemployed and continuing to collect thousands of dollars in other forms of governmental assistance. This is not a case where a desperate individual resorted to fraud simply to make ends meet. Rather, defendant wanted to make "fast money" (Doc. 30, at 7) and get rich by defrauding the federal government and cheating other people out of their tax returns.

Defendant's criminal history is replete with fraud and theft. Time and again she chose to cash bad checks, steal credit cards, and siphon funds from other peoples' bank accounts. Her performance under court supervision has been poor. None of her prior punishments have deterred her criminal conduct. Further, her PSR notes multiple points where information she provides does not match her records, particularly as to her drug and alcohol use. The Court has significant doubts as to whether defendant would be honest and compliant with her probation officer if released.

Her prior failure to accurately report her substance abuse history is particularly relevant to her performance on home confinement only a few months ago. On June 29, 2020, Salvation Army staff prompted defendant to submit a urine specimen. (Doc. 43-11, at 3). On July 7, 2020, defendant's sample tested positive for marijuana. (*Id.*). When questioned during the investigation, defendant stated "I ate a couple of marijuana brownies. That's it." (*Id.*).[8] During a hearing on the violation, defendant stated "I had some friends over and I consumed brownies that I didn't know had marijuana in them. I found out the next day after not feeling good, my stomach hurt, and that's when I was informed that the brownies she brought over were laced." (*Id.*). The Court finds this explanation patently unbelievable. It is unrealistic that defendant's friend brought a tray of marijuana brownies to her home while she was under home confinement without

---

[8] The report presents defendant's statements as quotes. The Court recognizes that they could be paraphrases.

11

mentioning its contents, that defendant ate the brownies without experiencing any smell, taste, or sensation that would alert her to the marijuana, that she did not discover her ingestion until the next day upon happening to ask, and that she then did not report the incident before being tested.  Given her history of marijuana abuse and providing false information, it is far more likely that defendant simply used marijuana.  Moreover, the fact that defendant had friends over to her home to share food indicates that she was not taking reasonable measures to protect herself from COVID-19 despite being released due to her underlying vulnerabilities.

Absent defendant's violation while on home confinement, this case would be a much closer call.  The Court would have had great doubts about whether supervision would be sufficient to deter defendant in light of her recidivist history and her four violations while incarcerated (for phone abuse twice, refusing to obey an order, and exchanging money without authorization).  (Docs. 43-8 & 43-10).  Unfortunately, defendant's violation while on home confinement confirms what the Court would have feared.  There is little more that can be said other than that defendant had her chance to show she could abide by the conditions of release while on home confinement and she failed.

The Court recognizes that defendant has been the victim of abuse in the past, that she has taken classes while incarcerated, and that she has a proposed release plan.  These facts, however, do little to excuse the offense conduct here, her criminal history, or her performance while on home confinement.  On balance, the remainder of defendant's term of incarceration is necessary to reflect the seriousness of her offense, promote respect for the law, provide just punishment, and protect the public.  Even restrictive forms of supervision such as home confinement would not be sufficient to deter defendant from engaging in unlawful conduct.  Although the Court is sympathetic to her health

12

Case 1:15-cr-00071-CJW-MAR   Document 46   Filed 01/27/21   Page 12 of 13

conditions, the benefits of her continued incarceration outweigh the increased risk of infection she faces in prison as opposed to the risk she would otherwise face if released.

### V. CONCLUSION

For these reasons, the Court **denies** defendant's motion for compassionate release. (Docs. 42 & 43). The Court also **denies** her pro se motion for the same reasons. (Docs. 39 & 44). Defendant must serve the remainder of her term of incarceration as previously directed. (Doc. 35).

**IT IS SO ORDERED** this 27th day of January, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa